**IN THE COURT OF APPEALS OF IOWA**

No. 22-2093
Filed April 12, 2023

**IN THE INTEREST OF J.C. AND N.C.,**
**Minor Children,**

**A.P., Mother,**
        Appellant,

**B.C., Father,**
        Appellant.
_____

        Appeal from the Iowa District Court for Polk County, Brent Pattison, District

Associate Judge.


        Parents separately appeal the termination of their parental rights.

**AFFIRMED ON BOTH APPEALS.**


        Deborah L. Johnson of Deborah L. Johnson Law Office, P.C., Altoona, for

appellant mother.

        Lisa A. Allison of Allison Law Firm, LLC, Des Moines, for appellant father.

        Brenna Bird, Attorney General, and Mary A. Triick, Assistant Attorney

General, for appellee State.

        Nicole Garbis Nolan of the Youth Law Center, Des Moines, attorney for J.C.

and guardian ad litem for minor children.

        ConGarry Williams of Juvenile Public Defender, Des Moines, attorney

for N.C.

Considered by Schumacher, P.J., Ahlers, J., and Mullins, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2023).

**MULLINS, Senior Judge.**

A mother and father separately appeal the termination of their parental rights to their children—born in 2006 and 2016—under Iowa Code section 232.116(1)(f) (2022). Both parents challenge the sufficiency of evidence supporting the ground for termination and request additional time to work toward reunification. The mother also argues termination is contrary to the children's best interests.

## I.       Background

The children came to the attention of the Iowa Department of Health and Human Services (HHS) in April 2021 upon allegations that the mother was using methamphetamine while caring for them. The mother did not cooperate with drug testing, and the HHS discovered she was recently discharged from opioid-abuse treatment due to a positive drug test. Because the mother would not cooperate with safety planning, the HHS sought and obtained an order for temporary removal. Pretty much all that was known about the father at this point was that he lived in Florida and had not had any contact with the mother or children for some time. Turns out, the mother had left Florida with the children several years before and never advised the father about where they were. The court subsequently adjudicated the children as in need of assistance.

From there, the mother avoided drug tests and denied use for several months. She did not meaningfully participate in any services until February 2022. At that point in time, she began a medication-assisted treatment (MAT) program, but that program was only aimed at her misuse of opioids, as opposed to methamphetamine abuse. She also began telehealth therapy. Also in February,

however, the mother's house burned down. One of the police officers who responded to the scene opined, based on her training and experience, the mother was "acting like she was high on methamphetamine or another stimulant." Two other officers concurred in this assessment.

The mother participated in her first formal drug screen in March, which was positive for methamphetamine. She largely continued to avoid drug testing requests from the HHS through the time of the first day of the termination hearing in September, although she did provide one negative test in May. And while she provided various negative drug screens during appointments with her MAT provider, those screens were neither observed nor random. The mother also rescheduled several of her appointments, and the MAT provider agreed it was "possible" that the mother rescheduled these appointments in order to allow her body to metabolize any methamphetamine in her system before she took the test. While the mother's therapist agreed she never noticed any behavioral indicators of use by the mother, the therapist only met with the mother in person twice, while the remainder of their sessions were over the phone.

While the father sought out services in Florida after he became involved in the proceedings, services were essentially non-existent there. The father moved to Iowa in February 2022 to have a more meaningful shot at reunification. The caseworker agreed the father participated in pretty much every service he could after moving to Iowa. However, he had not secured housing or employment by the time of the first day of the termination hearing. As to the father's housing, he was residing at a mission and was on a waitlist for an apartment. As to his employment, he has never held a job due to his mental-health diagnosis of schizophrenia, and

he relies solely on social security disability to meet his needs. The social worker testified that, given the father's long absence from the children's lives, any relationship between them is lacking, and even an additional six months would not allow those relationships to progress to an extent that the children could be placed in his custody. That said, the lack of a relationship between the father and children is not entirely his fault. Not only did the mother leave the father and take the children with her, but she did not tell the father where they relocated, and she has since influenced the children to fear the father. The caseworker additionally opined that the father could not provide full-time care to two children due to his mental-health issues, namely his schizophrenia. Yet, the father testified his medications stabilize the effects of his schizophrenia.

A permanency hearing was held over various days in April and May 2022. In its subsequent permanency order, the court determined the children could not wait any longer for the mother to establish and maintain sobriety. As to the father, the court noted he had not had meaningful contact with the children in years, although this was largely not his fault, and he "acknowledges a long struggle with his own mental health." Overall, the court determined "that reasonable progress is not being made by the parents in achieving the permanency goal of reunification" and, as such, modified the permanency goal to termination. The court noted its consideration of allowing only the father additional time but decided it would not alleviate the need for removal from his custody due to his current homelessness, "complex set of mental health issues," and "lengthy period of disconnection from the children."

The State filed its termination petitions in August, and the termination hearing was held over four days in September and October 2022. At the conclusion of the first day of the termination hearing on September 7, the State requested that the mother submit to hair-stat testing that very day. While her counsel agreed, the mother passively objected, noting "I have a big hole in the back of [my] head." The mother submitted to the testing, and she tested positive for methamphetamine. In a subsequent motion, the mother continued to deny using the substance and requested re-testing. The court denied the mother's request that it order re-testing but noted the HHS could do so if it desired.

On the third day of the hearing on October 12, the mother organized her own drug testing, and that hair-stat test was negative for all substances. On cross-examination about that testing at the fourth day of the hearing on October 21, the guardian ad litem pointed out that the mother had bleached her hair. The mother denied she did anything to her hair. While the court could not specifically recall what the mother's hair looked like at the time of the prior hearings, the court agreed, "I can tell its bleached in the back pretty high." Again, this drug testing was not random.

Throughout the proceedings, the mother has been hostile to pretty much everyone—the father, service providers, and even the children's guardian ad litem. She has repeatedly said inappropriate things to the children, which has resulted in her interactions with them being significantly curtailed. At the final day of the termination hearing, the older child—then sixteen years old—pleaded with the court to terminate his mother's parental rights.

In its ruling, the court detailed the mother's inability to abstain from methamphetamine use, mental-health struggles, inappropriate behavior toward the children, and general hostility. But the evidence about the father "told a very different story." The court highlighted the father's positive demeanor, patience, respectfulness, interest in the children, and unfettered cooperation with the HHS. All that said, the court acknowledged the father's ongoing struggles with meeting his own needs as a result of his "long-term, chronic mental health issues that have not always been well treated." Adding in the father's long absence from the children's lives and lack of stable housing, the court determined the father is not ready to have custody of the children, and both children are in need of permanency. Overall, the court found the children could not be returned to parental custody within the meaning of section 232.116(1)(f) and termination is in the children's best interests based on their extended period of removal and need for permanency. The court denied the mother's request for additional time, concluding her ongoing substance abuse and emotional outbursts resulting from her poor mental health would not be rectified within six months. The court acknowledged its answer to the father's request for an extension was a "closer" call. But, even assuming the father would be able to obtain safe and appropriate housing in the near future, the court determined he "would have a long way to go before he could demonstrate the ability to safely parent the children." So the court denied each parent's request for more time and terminated their parental rights.

Both parents appeal separately.

## II.	Standard of Review

We review termination proceedings de novo. *In re A.B.*, 956 N.W.2d 162, 168 (Iowa 2021); *In re C.Z.*, 956 N.W.2d 113, 119 (Iowa 2021). Our primary consideration is the best interests of the children, *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006), the defining elements of which are the children's safety and need for a permanent home. *In re H.S.*, 805 N.W.2d 737, 748 (Iowa 2011).

## III.	Discussion

The court applies a three-step analysis in conducting its de novo review of terminations of parental rights, asking whether (1) a statutory ground for termination is satisfied, (2) the children's best interests are served by termination, and (3) a statutory exception applies and should be exercised to preclude termination. *See In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022). We need only address the steps raised by the parents on appeal. *See In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010). If the challenged steps support termination, we then consider any ancillary issues raised by the parents, such as whether additional time is warranted. *See, e.g.*, *In re K.S.*, No. 22-1368, 2022 WL 10833216, at *3 (Iowa Ct. App. Oct. 10, 2022). We consider each parent's claims separately. *See In re J.H.*, 952 N.W.2d 157, 171 (Iowa 2020).

### A.	Mother

#### 1.	*Ground for termination*

For her challenge to the sufficiency of the evidence supporting termination under section 232.116(1)(f), the mother only challenges the final element—that the children could not be returned to her custody at the time of the termination hearing.

*See* Iowa Code § 232.116(1)(f)(4) (requiring clear and convincing evidence that children cannot be returned to parental custody "at the present time"); *In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010) (interpreting the statutory language "at the present time" to mean "at the time of the termination hearing").

Concerning her substance abuse, the mother doubles-down on her claim below that she does not use methamphetamine. She highlights her participation in MAT and her various negative drug tests. But the MAT was aimed at the mother's disorder concerning opioid—as opposed to methamphetamine—abuse. And the weight that should be afforded to her drug urinalysis testing through that treatment is little if any. *See In re A.W.*, No. 18-0382, 2018 WL 2084913, at *2 (Iowa Ct. App. May 2, 2018) (discussing expert testimony on "the ease of manipulating a UA"); *see also United States v. Jittaphol*, 598 F. Supp. 3d 22, 33 (D. Mass. 2022) (discussing a study that noted: "Drug metabolites are rapidly excreted in urine limiting the window of detection of a single use to a few days" (citation omitted)). Those tests were not random or observed and, in reality, the mother had the ability to delay those tests if she desired. Indeed, she exercised that ability several times.

The more formal drug screens sponsored by the HHS serve as a better benchmark. She largely evaded these drug tests. While she did provide a negative result in or about May 2022, she provided test results positive for methamphetamine both before and after that, including at the time of the first day of the termination hearing. While the mother claims this was a false positive, we, like the juvenile court, find that highly unlikely, especially given the high level of the

substance found in the specimen provided by the mother.[1]  The mother also points to her negative testing results in October, which she organized without the oversight of the HHS.  But, like the tests through the MAT provider, this was not random, and there is evidence that the mother bleached her hair in an attempt to influence the results.  *See A.W.*, 2018 WL 2084913, at *2 (discussing expert testimony about the ease of "manipulating a hair test by dying, bleaching, or shampooing hair").

Overall, the record supports the juvenile court's conclusion that the mother can demonstrate only short stints of sobriety but cannot maintain ongoing, long-term sobriety.  This serves as clear and convincing evidence that the children cannot be returned to her custody due to her ongoing methamphetamine use.  *See, e.g.*, *In re E.D.*, No. 21-0221, 2021 WL 3897861, at *2 (Iowa Ct. App. Sept. 1, 2021) (finding mother's "pattern of maintaining sobriety for short stints" resulted in conclusion that child could not be returned to her custody); *In re P.D.*, No. 19-1824, 2019 WL 6894420, at *1 (Iowa Ct. App. Dec. 18, 2019) (finding short stints of sobriety followed by relapse continued to present risk of adjudicatory harm).

The mother's mental health and behavior toward the children also poses an ongoing risk for adjudicatory harm.  While the mother points out she has been regularly attending mental-health therapy, that only makes her ongoing outbursts and aggression even more troubling.  She continues to engage in behavior that she has been told time and time again is harmful to the children's emotional and

---

[1]  The level of methamphetamine found in the mother's hair specimen was 4985 pg/mg.  To put that number in perspective, the confirmation cutoff for methamphetamine was 500 pg/mg.

mental health. While she submits on appeal that the father "is the actual danger and threat to them," and that could have been true in the past, the mother is the one who currently poses a danger and threat to the children.

We agree with the juvenile court that the children could not be returned to the mother's custody at the time of the termination hearing due to her ongoing substance-abuse and mental-health struggles, and the evidence was therefore sufficient for termination under section 232.116(1)(f).

### 2. Best interests

The mother also argues termination is contrary to the children's best interests. In determining whether termination is in the best interests of children, we "give primary consideration to the child[ren]'s safety, to the best placement for furthering the long-term nurturing and growth of the child[ren], and to the physical, mental, and emotional condition and needs of the child[ren]." Iowa Code § 232.116(2).

The mother asserts there are compelling reasons to not terminate, namely that any ongoing parenting deficiencies can be addressed through more services and she has "demonstrated a willingness to cooperate with services, both substance abuse and mental health." But that is not the true state of affairs. The mother has been resistant to services from the HHS. While the mother has sought out and participated in services of her own finding, those services have had no diminishing effect on the ongoing need for removal. And they appear to be services in which the mother can exercise a heavier hand in manipulating her supposed progress without HHS oversight. The mother also notes that the younger child has been in various placements and there is a possibility that his

current placement in the same home as the older child may not work out as a certain permanency option. While we acknowledge the ultimate permanency picture is not concrete for the younger child, "'whatever the future holds for [him], it will be better than the "parentless limbo" [he has] already been in' since removal." *In re N.B.*, No. 22-1684, 2023 WL 2148780, at *3 (Iowa Ct. App. Feb. 22, 2023) (citation omitted).

We agree with the juvenile court that termination is in the children's best interests.

### 3.    *Additional time*

Finally, the mother requests additional time to work toward reunification. If, following a termination hearing, the court does not terminate parental rights but finds there is clear and convincing evidence that the children remain in need of assistance, the court may enter an order in accordance with section 232.104(2)(b). Iowa Code § 232.117(5). Section 232.104(2)(b) affords the juvenile court the option to continue placement of a child for an additional six months if the court finds "the need for removal . . . will no longer exist at the end of the additional six-month period."

The mother submits "she has demonstrated a commitment to continuing with her service providers" and additional time would allow "the court the opportunity to continue to moniter [her] by way of more consistent testing to give a clearer picture of the concerns regarding substance abuse." As already noted, the services the mother has chosen to participate in have not eliminated the need for removal, despite the fact that she has been participating in them for several months. Furthermore, the court already had a clear picture of the concerns

regarding the mother's substance abuse, and the mother has already shown that she will continue to avoid submitting to reliable drug testing by the HHS. On our review, we are unable to enumerate any "specific factors, conditions, or expected behavioral changes" that would support a determination that the need for removal will no longer exist after six months. *See id.* § 232.104(2)(b). As such, we conclude additional time is not warranted.

The mother also asserts that delaying permanency will not harm the children, implying they can simply remain in their current placements and await permanency until she gets her affairs in order. But the law is clear that "[t]he crucial days of childhood cannot be suspended while parents experiment with ways to face up to their own problems." *In re A.C.*, 415 N.W.2d 609, 613 (Iowa 1987). So we are unable to conclude an extension is warrantedd upon this basis either.

**B.      Father**

*1.      Ground for termination*

The father likewise challenges the State's establishment of the final element of section 232.116(1)(f), that the children could not be returned to his custody at the time of the termination hearing. *See* Iowa Code § 232.116(1)(f)(4); *D.W.*, 791 N.W.2d at 707 (Iowa 2010). He argues that the State did not present any evidence that the children would be in "imminent danger" if placed in his custody. While such evidence would presumably satisfy the State's burden, imminent danger is not a strict requirement. Instead, all the State was required to show was that the children could not be returned to the father's custody at the time of the termination hearing.

Aside from the father's housing situation, he does not have a meaningful relationship with either of the children, although a relationship with the younger child was certainly developing. Furthermore, the father does have a complex history of mental-health problems, which he does not dispute. Those issues do appear to have stabilized as a result of the father's utilization of treatment and medication management. But that stabilization has not been tested by an environment in which the father has to raise and care for two children basically on his own with no recent parenting experience to rely upon. The father has not been a full-time parent to these children for several years, and he has certainly never parented two children on his own. In addition, the older child is adamant in not returning to the father's custody, which the father understands and "continues to be willing to honor," due to his age. And the younger child has serious behavioral issues, which the father has no experience with tending to.

On our review, we agree with the juvenile court that the children could not be placed in the father's custody at the time of the termination hearing.

### 2. Additional time[2]

The real question is whether the father should be granted additional time to work toward reunification, particularly as to the younger child. In support of his request for an extension, the father generally highlights his meaningful participation in services, cooperation with the HHS, development of a relationship with the children since his move to Iowa, and his commendable performance

---

[2] We disagree with the State that the father did not preserve error on this issue because it was not raised in his written closing argument. The issue was placed before the court at the hearing, and the court considered the issue and ruled on it.

during visits. The State basically responds the father would still not be ready to parent the children if given an additional six months, noting he "was only in the beginning stages of developing a relationship with the boys" and "was still struggling to meet his own basic needs and had yet to secure appropriate housing."

To put it simply, the father's efforts to resume custody of these children were extraordinary. He moved half way across the country to facilitate reunification and did everything HHS asked, and more. While he was initially largely denied contact with the children both before and after the move, he did not get discouraged. He took the appropriate steps, progressed to visits, and attempted to rebuild his relationship with the older child and build a relationship with the younger child, who was only months old when the mother took off with the children and did not advise the father of their whereabouts.

As the juvenile court recognized, whether to grant the father an extension is a close call. The only flies in the ointment cited by the juvenile court were the father's housing situation, ability to care for the children as a single parent, and stability in regards to his own mental-health needs. Viewing the children in isolation, the questions we are asked to answer would be simpler. On the one hand, the father agrees the older child is in a good place, and his wishes to proceed to permanency in his current placement should be honored, given his age and maturity. We agree this is in the older child's best interests and, as a result, the father should not be granted an extension as to the older child. On the other hand, a case can be made that the father should be granted additional time as to the younger child on the *assumption* that he could cure the juvenile court's concerns for his housing, ability to provide appropriate care to a child with special needs as

a single parent with no prior experience, and ability to sustain extended stability in regards to his own mental health. That assumption still comes with major doubts, however, mainly because the meat and cheese in that task sandwich is an arguably insurmountable task to complete in six months, especially in light of the father's long absence from the child's life and parenting in general, as well as the level of his relationship with the child, which is still in the developing stages.

Looking at the whole picture, even assuming the need for removal of the younger child could be alleviated in six months, which is questionable, "we must also consider whether further delay is in [the younger child's] best interests." *In re W.T.*, 967 N.W.2d 315, 323 (Iowa 2021). On our de novo review, we conclude that it is not. The younger child is currently placed in the same home as his older brother, and that placement intends to adopt the older child. The older child serves as the only constant in the younger child's life and they obviously share a strong sibling bond. In comparison, the younger child's bond with the father is limited at best. While questions remain about whether the foster home can impact the younger child as positively as it unquestionably has the older child, the outlook seems bright at this juncture. And the questions surrounding whether the father can alleviate the need for removal if given an additional six months are plagued with more doubts than the question of whether putting the child on a path to permanency now will better serve his best interests.

We commend the father for his performance in these unfortunate circumstances. But, by the time of the termination ruling, the younger child had already been in a state of limbo for more than eighteen months, well beyond the statutory twelve-month period. "It is unnecessary to take from the child[]'s future

any more than demanded by statute" and, while "some extensions will prove to be appropriate," one extension was already built into this proceeding, and there are too many questions about whether another will be fruitful. *A.C.*, 415 N.W.2d at 614. Courts operate under a constant acknowledgement "that, if the plan fails, all extended time must be subtracted from an already shortened life for the child[] in a better home." *Id.* Viewing this child's protracted lack of permanency with a sense of urgency, we conclude an extension of time now would be contrary to the child's best interests. As a result we affirm the termination of the father's parental rights.

## IV. Conclusion

We affirm the termination of both parents' rights.

**AFFIRMED ON BOTH APPEALS.**